1  Katherine Hendrix (Bar No. 336792)
   The Humane Society of the United States
2  1255 23rd St. NW, Suite 450
   Washington, D.C. 20037
3  khendrix@humanesociety.org
   (617) 872 0558
4
   Nicholas Arrivo (Bar No. 296173)
5  The Humane Society of the United States
   1255 23rd St. NW, Suite 450
6  Washington, D.C. 20037
   narrivo@humanesociety.org
7  (202) 961 9446

8  *Attorneys for Intervenor-Defendants*
   *The Humane Society of the United States, Humane*
9  *Society International, and the Center for Biological*
   *Diversity*
10

11             UNITED STATES DISTRICT COURT

12            EASTERN DISTRICT OF CALIFORNIA

13

14  BOOT BARN, INC., a Delaware            Case No. 2:22-cv-02105-KJM-CKD
    Corporation, and DAN POST BOOT
15  COMPANY, a Tennessee Corporation,      **MEMORANDUM OF POINTS AND**
                                           **AUTHORITIES IN OPPOSITION TO**
16             Plaintiffs,                 **PLAINTIFFS' MOTION FOR SUMMARY**
                                           **JUDGMENT AND IN SUPPORT OF**
17      v.                                 **INTERVENOR-DEFENDANTS' CROSS-**
                                           **MOTION FOR SUMMARY JUDGMENT**
18  ROB BONTA, in his official capacity as
    Attorney General for the State of California,
19                                         The Honorable Kimberly J. Mueller
               Defendant,                  Date: December 1, 2023
20                                         Time: 10:00 AM
    THE HUMANE SOCIETY OF THE              Courtroom 3
21  UNITED STATES, HUMANE SOCIETY
    INTERNATIONAL, and CENTER FOR
22  BIOLOGICAL DIVERSITY,

23             Intervenor-Defendants.

24

25

26

27

28

Case No. 2:22-cv-02105-KJM-CKD

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

1

# TABLE OF CONTENTS

2

I.   INTRODUCTION...................................................................................................1

3

II.  STATEMENT OF FACTS.....................................................................................2

4

   A.  California Penal Code Section 653o..............................................................2

5

   B.  Teju, Ring, and Nile Lizards........................................................................3

6

   C.  The Convention on International Trade in Endangered Species
      of Wild Fauna and Flora..............................................................................4

7

   D.  United States' Implementation of CITES......................................................5

8

   E.  Plaintiffs' "CITES Permit" ..........................................................................6

9

III. LEGAL STANDARDS...........................................................................................7

   A.  Summary Judgment......................................................................................7

10

   B.  Preemption...................................................................................................8

11

IV. ARGUMENT..........................................................................................................9

12

   A.  Section 653o(c) is Not Preempted Because CITES and
      Implementing U.S. Regulations Expressly Contemplate and

13

      Authorize State-Level Regulation..............................................................10

14

   B.  There is No Conflict Preemption Because Section 653o(c)
      Does Not Make it "Impossible" to Comply with CITES

15

      Implementing Regulations..........................................................................14

16

   C.  Lawful Import of a Specimen Under CITES Does Not Provide
      an Affirmative Grant of Authority for Domestic Commerce

17

      in the United States....................................................................................15

18

   D.  Section 653o Does Not Provide an Obstacle to the Objectives
      of CITES or its Implementing Regulations.................................................19

19

        i.   State Restrictions Do Not Need to Have a "Conservation
           Purpose" in Order to be Valid Under CITES or its

20

           Implementing Regulations................................................................19

21

        ii.  AB 1260 is a Conservation Statute..................................................22

22

V.  CONCLUSION.....................................................................................................24

23

24

25

26

27

28

Case No. 2:22-cv-02105-KJM-CKD

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Am. Civil Liberties Union of Nev. v. City of Las Vegas*,
   333 F.3d 1092 (9th Cir. 2003)..................................................................................................7

4

*April in Paris v. Bonta*, No. 2:19-CV-02471-KJM-CKD,
   2023 WL 2392818 (E.D. Cal. Mar. 7, 2023) ...........................................................9, 10, 15

5

6

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*,
   33 F.4th 1107 (9th Cir. 2022), *cert. denied sub nom. Ass'n des Éleveurs de
   Cananards et D'oies du Quebec v. Bonta*, 143 S. Ct. 2493 (2023) ....................................15

7

*Bank of Am. v. City & Cnty. of San Francisco*,
   309 F.3d 551 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc*
   (Dec. 20, 2002)........................................................................................................................8

8

9

*Barrientos v. 1801-1825 Morton LLC*,
   583 F.3d 1197 (9th Cir. 2009)............................................................................................8, 12

10

*Chamber of Com. of U.S. v. Whiting*,
   563 U.S. 582 (2011) ...............................................................................................................8

11

12

*Cresenzi Bird Importers, Inc. v. State of N.Y.*,
   658 F. Supp. 1441 (S.D.N.Y.), *aff'd*, 831 F.2d 410 (2d Cir. 1987) ....................................17

13

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ...............................................................................................................3

14

15

*Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*,
   476 F.3d 326 (5th Cir. 2007).................................................................................................14

16

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982) .............................................................................................................12

17

18

*Florida Lime & Avocado Growers, Inc. v. Paul*,
   373 U.S. 132 (1963) .............................................................................................................14

19

*Geier v. Am. Honda Motor Co., Inc.*,
   529 U.S. 861 (2000) ...............................................................................................................8

20

21

*H.J. Justin & Sons, Inc. v. Deukmejian*,
   702 F.2d 758 (9th Cir. 1983)...................................................................................11, 17, 20

22

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   959 F.3d 1201 (9th Cir. 2020)......................................................................8, 12, 18, 19, 21

23

24

*Man Hing Ivory & Imports, Inc. v. Deukmejian*,
   702 F.2d 760 (9th Cir. 1983).............................................................................................5, 11

25

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) .........................................................................................................8, 10

26

27

28

Case No. 2:22-cv-02105-KJM-CKD

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

*Merck Sharp & Dohme Corp. v. Albrecht*,
    139 S. Ct. 1668 (2019) ............................................................................................. 7

*Nacarino v. Kashi Co.*,
    77 F.4th 1201 (9th Cir. 2023) ................................................................................ 13

*Pena v. Lindley*,
    898 F.3d 969 (9th Cir. 2018) ................................................................................. 22

*R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*,
    29 F.4th 542 (9th Cir. 2022), *cert. denied sub nom. R.J. Reynolds Tobacco Co.*
    *v. Cnty. of Los Angeles, California*, 143 S. Ct. 979 (2023) .................................. 16

*R.J. Reynolds Tobacco Co. v. Durham Cnty., N.C.*,
    479 U.S. 130 (1986) ............................................................................................... 8

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976) ........................................................................................ 11, 12

*Turner Broad. Sys., Inc. v. F.C.C.*,
    520 U.S. 180 (1997) ............................................................................................. 23

*UFO Chuting of Hawaii, Inc. v. Young*,
    380 F. Supp. 2d 1160 (D. Haw. 2005), *aff'd sub nom. UFO Chuting of Hawaii,*
    *Inc. v. Smith*, 508 F.3d 1189 (9th Cir. 2007) ...................................................... 16

*Ventress v. Japan Airlines*,
    747 F.3d 716 (9th Cir. 2014) ................................................................................... 7

*Wyeth v. Levine*,
    555 U.S. 555 (2009) .......................................................................................... 8, 14

*Yamagata v. Reckitt Benckiser LLC*,
    445 F. Supp. 3d 28 (N.D. Cal. 2020) ..................................................................... 7


**Statutes**

16 U.S.C. § 1532(3) .................................................................................................... 23

Cal. Fish & Game Code § 2022(b) ............................................................................ 23

Cal. Fish & Game Code § 2118(b) .............................................................................. 2

Cal. Food & Agric. Code § 481(b) ............................................................................... 2

Cal. Penal Code § 596.5 .............................................................................................. 2

Cal. Penal Code § 653o .................................................................................... 2, 3, 14

Haw. Rev. Stat. Ann. § 183D-66(a) .......................................................................... 23

Md. Code., Nat. Res. § 10-2B-04 .............................................................................. 23

N.M. Stat. Ann. § 17-2-14 ........................................................................................... 2

Ohio Rev. Code Ann. § 935.01(19) ............................................................................. 2

Ohio Rev. Code Ann. § 935.02(A) .............................................................................. 2

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

**Other Authorities**

CITES, Mar. 3, 1973, 27 U.S.T. 1087 ........................................................ 4, 5, 10, 11, 13, 20, 21

Revision of Regulations Implementing the Convention on International Trade in
    Endangered Species of Wild Fauna and Flora (CITES), 72 Fed. Reg. 48,402,
    48,406 (Aug. 23, 2007) ............................................................................................. 12, 18

S. Comm. Natural Res. & Water Rep., AB 1260, Cal. 2019-2020 Reg. Sess. (2019) ........ 2, 3, 22

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................. 7

Fed. R. Evid. 702 ................................................................................................................. 3

**Regulations**

50 C.F.R. § 13.42 ............................................................................................................... 16

50 C.F.R. § 14.61 ................................................................................................................. 6

50 C.F.R. § 17.42(a)(2)(ii) ................................................................................................ 15

50 C.F.R. § 23.1(a) .............................................................................................................. 5

50 C.F.R. § 23.2 ................................................................................................................. 11

50 C.F.R. § 23.20(e) ................................................................................................. 4, 5, 14, 15

50 C.F.R. § 23.23(c)(20) ...................................................................................................... 6

50 C.F.R. § 23.3 ................................................................................................... 6, 11, 12, 20

50 C.F.R. § 23.5 ................................................................................................................... 5

50 C.F.R. § 23.56 ............................................................................. 1, 6, 11, 12, 16, 19, 20, 23

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Seeing this Court's ruling in recent preemption cases relating to California Penal Code Section 653o's ("Section 653o") restrictions on trade in crocodilian species listed under the federal Endangered Species Act ("ESA"), Plaintiffs—would-be California retailers of lizard-skin leather products—now attempt to achieve the same result with respect to Section 653o's application to three lizard species. But this case is different. Here, no ESA regulation authorizes the sale of products of the lizard species at issue, and so the ESA's preemption clause cannot and does not apply. In fact, there is no claim of express preemption in this case at all. Instead, Plaintiffs ask this Court to imply preemptive effect of an international trade treaty, the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), merely because the ESA is the vehicle through which the treaty is implemented. But CITES does not require U.S. federal authorization for import of these species or set standards for subsequent domestic trade in them, and it in fact *expressly disavows preemption* of such. The ruling Plaintiffs seek would expand existing preemption law to an untold degree; invalidate state and local laws across the country; and undermine international, Congressional, and federal regulatory intent.

Plaintiffs ask this Court to accept one of two novel preemption theories. The first is that there is a direct conflict between federal rules for import of lizard skins from outside the country and California's regulation of the in-state sale of those skins such that compliance with both is "physically impossible." The second is that a U.S. Fish and Wildlife Service ("FWS") regulation indicating that CITES document holders "must comply with all applicable . . . wildlife . . . conservation laws," 50 C.F.R. § 23.56(a)(1), is evidence of sweeping Congressional intent to preempt all state laws that impact any of the tens of thousands of CITES-listed species that lack what Plaintiffs deem to be an adequate "conservation purpose," a new standard this Court is asked to both invent and then apply. Neither theory is compelling, and both have been repeatedly disavowed by the federal agency responsible for implementing and enforcing both CITES and the ESA. Moreover, Plaintiffs do not possess the United States CITES import permit they claim to hold, undermining their entire theory of preemption by authorization.

Both of Plaintiffs' theories would have enormously disruptive effect, fundamentally altering

states' ability to regulate commerce within their borders and requiring courts across the country to re-examine every state law that governs conduct involving a CITES-listed species for evidence that the law operates "to protect species in trade that [the state] found to be 'threatened with extinction,'" ECF 25-1, at 19,[1] and strike down as unconstitutional those that do not.[2] Congress does not hide these kinds of preemptive elephants in mouseholes, and the Court should reject Plaintiffs' illusory assertions to the contrary.

## II. STATEMENT OF FACTS

A. <u>California Penal Code Section 653o</u>

For more than fifty years, California has barred trade in certain animal species under Section 653o. This wildlife protection statute applies to products made from more than 20 categories of animals, including whales, feral horses, wolves, and elephants. Cal. Penal Code § 653o. In 2019, in response to the "well-documented concern in the academic press about the potential overexploitation of reptiles," the state legislature adopted California Assembly Bill No. 1260 ("AB 1260"), which amended Section 653o to include Teju, Ring, and Nile lizards (among other species), in order "to limit demand for the trade in certain species' skin to reduce the risks to existing populations." S. Comm. Natural Res. & Water Rep., AB 1260, Cal. 2019-2020 Reg. Sess., at 5, 6 (2019), attached as Decl. of Katherine Hendrix ("Hendrix Decl.") Ex. 1 ("S. Natural Res. Rep."). The relevant portion of Section 653o now reads:

---

[1] All citations to ECF documents use ECF, rather than authored, pagination.
[2] There are an untold number of laws—in California and across the country—that would be at least *partially* unconstitutional under Plaintiffs' theory. *See, e.g.*, Cal. Food & Agric. Code § 481(b) (allowing for the "control of avian influenza," including in CITES Appendix II geese and waterfowl, to protect public health); Cal. Fish & Game Code § 2118(b) (prohibiting the import, possession, and release of all members of the family Viverridae, including CITES Appendix II civets and linsangs, because they are "undesirable and a menace . . . to the public health or safety"); Cal. Penal Code § 596.5 (prohibiting abusive behavior toward elephants, including those listed on CITES Appendix II); *see also*, *e.g.*, Ohio Rev. Code Ann. §§ 935.01(19), 935.02(A) (prohibiting possession of CITES Appendix II primates to protect public safety); N.M. Stat. Ann. § 17-2-14 (prohibiting possessing, injuring, killing, and selling birds of the order Falconiformes, including CITES Appendix II hawks and vultures).

1

> Commencing January 1, 2022, it is unlawful to import into this state for
> commercial purposes, to possess with intent to sell, or to sell within the state,
> the dead body, or any part or product thereof, of an iguana, skink, caiman,
> hippopotamus, or a Teju, Ring, or Nile lizard.

Cal. Penal Code § 653o(c).

    B.  <u>Teju, Ring, and Nile Lizards</u>[3]

    Teju lizards—which include *Salvator merianae*, *Salvator rufescens*, and *Tupinambis teguixin*—are large reptiles, native to South America, that can live up to 20 years. They are known for their docile nature and high intelligence, which has led to their increased exploitation in international trade, both as pets and in the leather trade. There is "a significant worldwide trade in teju leather skins on the order of hundreds of thousands of skins annually." S. Natural Res. Rep., at 4. Ring lizards, or *Varanus salvator*, are native to South Asia and usually grow to around six feet long. They are the most traded lizard species in the area, with over 8 million specimens exported between 1998 and 2007. Vincent Nijman, *An Overview of International Wildlife Trade from Southeast Asia*, 19 Biodiversity & Conservation 1101, 1109 (2010), attached as Hendrix Decl. Ex. 2. Nile lizards, or *Varanus niloticus*, are among the largest lizards in the world, growing to over seven feet long, and are native to Sub-Saharan Africa. "[T]ens to hundreds of thousands of the skins of the Ring and Nile lizards [are] regularly exported worldwide annually according to CITES." S. Natural Res. Rep., at 5. The reptile skin industry generates hundreds of millions of dollars each year, incentivizing increased trade in these species. *Reptile Skins, Raw*, Observatory

---

[3] Intervenor-Defendants contend that summary judgment should be granted to them purely as a matter of law and is not dependent on any factual question. Nevertheless, what Plaintiffs call "expert reports," ECF 25-1, at 20 (referring to Plaintiffs' Exhibits C and D, ECF 25-2, at 11-26), do not meet the standard for expert testimony under Federal Rule of Evidence 702 or the *Daubert* standard. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588-95 (1993). The opinions set forth in Plaintiffs' Exhibits C and D—including the type and severity of exploitation these lizards face, currently or in the past—are disputable, but also immaterial to the matter currently before the Court.

Econ. Complexity, https://oec.world/en/profile/hs/reptile-skins-raw (last visited Oct. 5, 2023),

attached as Hendrix Decl. Ex. 3. Because of these threats, Teju, Ring, and Nile lizards were added

to CITES Appendix II almost 50 years ago.[4]

C.   The Convention on International Trade in Endangered Species of Wild Fauna and Flora

CITES is a treaty that governs international trade of imperiled species of wildlife and plants.

CITES, Mar. 3, 1973, 27 U.S.T. 1087. CITES recognizes that "international cooperation is

essential for the protection of certain species of wild fauna and flora against over-exploitation

through international trade," while maintaining "that peoples and States are and should be the best

protectors of their own wild fauna and flora." *Id.*, Preamble. To receive protection under CITES,

species must be included on one of CITES' three Appendices, each of which provides varying

degrees of limitation on international trade in specimens (including skins and other parts) of those

species.

If a wildlife trader, for example, wishes to import a species listed under Appendix I, they must

obtain both an "import permit [from the Management Authority of the country into which they

want to bring the specimen] *and* either an export permit or a re-export certificate" from the

country of export's Management Authority. *Id.*, art. III, ¶ 3 (emphasis added). Both import

permits and export permits are subject to certain conditions. *See id.*, art. III, ¶¶ 2(a)-(d), 3(a)-(c).

On the other hand, if the same wildlife trader wishes to import a species listed under Appendix II,

they must obtain "either an export permit or a re-export certificate" from the country of export's

Management Authority, *id.*, art. IV, ¶ 4, but no import permit. Indeed, there is no such thing as a

United States CITES import permit for Appendix II species. *See* 50 C.F.R. § 23.20(e).

---

[4] Nile and Ring lizards were added to CITES Appendix II in 1975, and the three Teju lizards were added to CITES Appendix II in 1977. *Checklist of CITES Species*, CITES, https://checklist.cites.org/#history-download (search "Varanus salvator," "Varanus niloticus," "Salvator merianae," "Salvator rufescens," and "Tupinambis teguixin"; then click "Show More" after each search) (last visited Oct. 5, 2023).

1   CITES, true to its assertion "that peoples and States are and should be the best protectors of

2   their own wild fauna and flora," CITES, 27 U.S.T. 1087, Preamble, includes an Article dedicated

3   to explaining the treaty's "Effect on Domestic Legislation and International Conventions," *id.*, art.

4   XIV. That provision recognizes that the provisions and requirements of CITES "shall in no way

5   affect the right of Parties to adopt . . . stricter domestic measures regarding the conditions for

6   trade, taking, possession or transport of specimens of species included in Appendices I, II and III,

7   or the complete prohibition thereof." *Id.*, art. XIV, ⁋ 1(a).[5] The Article also states that

8

9           [t]he provisions of the present Convention shall in no way affect the
10          provisions of *any domestic measures* . . . relating to other aspects of
            trade, taking, possession, or transport of specimens which is in
11          force or subsequently may enter into force for any Party including
            any measure pertaining to the Customs, public health, veterinary or
12          plant quarantine fields.

13   *Id.*, art. XIV, ⁋ 2 (emphasis added).

14       D.   United States' Implementation of CITES

15       The United States implements CITES through the Endangered Species Act and federal

16   regulations issued by FWS. *Man Hing Ivory & Imports, Inc. v. Deukmejian*, 702 F.2d 760, 762

17   (9th Cir. 1983); 50 C.F.R. § 23.1(a). These regulations govern trade of CITES-listed species and

18   specimens thereof into or out of the United States and implement the requirements of CITES. *See*

19   50 C.F.R. § 23.20(e) (requiring an "[e]xport permit (§ 23.36) or re-export certificate (§ 23.37)"

20   for trade in Appendix II species).

21

22       FWS regulations make clear that receipt of a CITES document[6] does not exempt one from

23   compliance with any other requirements, including both other federal permitting schemes and

24

25   _____

26   [5] CITES defines "trade" as "export, re-export, import and introduction from the sea." *Id.*, art. I, ⁋
     c.
27   [6] A "CITES document or CITES exemption document" is defined as "any certificate, permit, or
     other document issued by a Management Authority of a Party or a competent authority of a non–
28   Party whose name and address is on file with the Secretariat to authorize the international

1   other sub-jurisdictions' laws. One CITES implementing regulation addresses this question

2   directly. Aptly titled "What other wildlife and plant regulations may apply?," it references several

3   federal requirements—including those under the ESA, the Migratory Bird Treaty Act, and

4   regulations from four other agencies—and provides a general disclaimer to those engaging in

5   activities with specimens of CITES-listed species: "You may also need to comply with other

6   Federal, State, tribal, or local requirements." 50 C.F.R. § 23.3(a), (c), (d); *see also* 50 C.F.R. §

7   23.56(a)(1) ("You must comply with the provisions of part 13 of this subchapter [which identifies

8   general permit procedures] as conditions of the document, as well as other applicable regulations

9   in this subchapter, including, but not limited to, any that require permits. You must comply with

10  all applicable local, State, Federal, tribal, and foreign wildlife or plant conservation laws.").

11          E.   Plaintiffs' "CITES Permit"

12          Plaintiffs, Boot Barn, Inc. and Dan Post Boot Company, are retailers who wish to sell

13  products made from the skin of Teju, Ring, and Nile lizards in California. ECF 25-1, at 9; ECF

14  25-3, ¶ 16. Dan Post Boot Company claims to have a "permit to trade in CITES-listed Argentine

15  black and white tegu lizards," ECF 25-1, at 11 n.4, which Plaintiffs attach as Exhibit A, ECF 25-

16  2, at 3. All valid CITES documents must include on the document "[t]he type of CITES document

17  (import, export, re-export, or other)." 50 C.F.R. § 23.23(c)(20).

18          Plaintiffs' Exhibit A is a FWS Form 3-177, a declaration completed by importers and

19  exporters of all wildlife specimens (not only CITES-listed ones), and not a permit. *See* ECF 25-2,

20  at 3; *see also* 50 C.F.R. § 14.61 ("Importers or their agents must furnish all applicable information

21  requested on the Form 3-177 and the importer, or the importer's agent, must certify that the

22  information furnished is true and complete to the best of his/her knowledge and belief."); 50

23  C.F.R. § 14.61 (part 14 provides "uniform rules and procedures for the importation, exportation,

24  movement of CITES specimens." 50 C.F.R. § 23.5.

- 6 -                          Case No. 2:22-cv-02105-KJM-CKD

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

and transportation of wildlife" and is not specific to CITES). Nothing on Plaintiffs' Exhibit A

indicates that it is a CITES document. *See* ECF. 25-2, at 3; 50 C.F.R. § 23.23(c)(20). As Mr.

McRae's declaration acknowledges, Form 3-177 does provide a space for both "the foreign and

U.S. CITES permit numbers (box #17)," if applicable. ECF 25-1, at 28. In box "17b. U.S. CITES

Perm. Num.," Plaintiffs' Exhibit A contains no numbers, but two letters, repeated four times:

"NA." ECF. 25-2, at 3. Plaintiffs have not introduced evidence they hold any CITES import

permit.

### III. LEGAL STANDARDS

A. <u>Summary Judgment</u>

Summary judgment is appropriate when the moving party "shows that there is no genuine

dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Cross-motions for summary judgment are evaluated separately under the same

standard. *Am. Civil Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir.

2003). When there is no dispute as to material facts, as here,[7] the question is a purely legal one.

*Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1676 (2019) ("We here decide that a

judge, not the jury, must decide the pre-emption question."); *Yamagata v. Reckitt Benckiser LLC*,

445 F. Supp. 3d 28, 33 (N.D. Cal. 2020) ("Preemption is a question of law, and so it's for the

Court to decide fully on summary judgment, even if the resolution of a factual dispute is

involved.").

---

[7] While Intervenor-Defendants do not admit all "facts" submitted in Plaintiffs' Statement of
Material Facts, ECF 25-3, these disagreements are either not material to the present inquiry (¶¶ 8-
11) or are argument or legal conclusions styled as facts (¶¶ 12-14). *See* Intervenor-Defs.' Resp.
Pls.' Statement Material Facts.

B. <u>Preemption</u>

Federal preemption may be either express or implied, and "[i]mplied preemption comes in two forms: conflict preemption and field preemption." *Ventress v. Japan Airlines*, 747 F.3d 716, 720 (9th Cir. 2014). Conflict preemption exists "when state law actually conflicts with federal law," either because "compliance with both federal and state regulations is a physical impossibility," or because state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Dec. 20, 2002) (internal quotations omitted). These clashes between federal and state law are most obvious when it is impossible to comply with both sets of standards. *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000) ("a court should not find pre-emption too readily in the absence of clear evidence of a conflict").

In all preemption cases, there is a "presumption against preemption," *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1209 (9th Cir. 2009), because "the historic police powers of the States [are] not to be superseded by [federal action] unless that was the clear and manifest purpose of Congress," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotations omitted). This is particularly true when, as here, "Congress has legislated . . . in a field which the States have traditionally occupied." *Id.* (alteration in original) (internal quotations omitted). "'[T]he purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Moreover, "'[p]re-emption should not be inferred . . . simply because the agency's regulations are comprehensive.'" *Barrientos*, 583 F.3d at 1208 (second alteration in original) (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty., N.C.*, 479 U.S. 130, 149 (1986)). Rather, "'a high threshold must be met' before a court will conclude that a federal law has impliedly preempted a state law." *In re Volkswagen "Clean Diesel" Mktg.*,

1   *Sales Pracs., & Prod. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (quoting *Chamber of*

2   *Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011)).

3       **IV. ARGUMENT**

4       Here, unlike in *April in Paris*, Plaintiffs submit no express preemption argument, ECF 25-1, at

5   12,[8] nor do they advance a theory of implied field preemption. Instead, Plaintiffs advance two

6   formulations of implied conflict preemption. First, that Section 653o is preempted because it is

7   impossible to comply with both it and the federal regulatory scheme; and second, that Section

8   653o is preempted because it poses an obstacle to the purposes of the federal scheme. Each of

9   these arguments is undermined by the fact that both CITES itself and its U.S. implementing

10  regulations expressly anticipate and allow for more restrictive state measures. Plaintiffs also fail

11  to present any viable claim of traditional conflict preemption, where compliance with state law

12  makes compliance with federal law impossible, illustrated perfectly by the fact that Plaintiffs are

13  currently in compliance with both California and U.S. law. Nothing in federal (or international)

14  law requires that Plaintiffs engage in commercial conduct in these lizard species in California,

15  and the implementation of CITES through the ESA does not guarantee Plaintiffs the right to trade

16  in specimens of CITES Appendix II species in conflict with state law. Moreover, despite their

17  repeated and misleading suggestions to the contrary, Plaintiffs do not possess a United States

18  CITES import permit for the lizard species at issue here. They could not possibly possess such a

19  permit because, for Appendix II species, CITES and its implementing regulations only require

20  permits for the country of *export*, not the country of *import*. This leaves only the thinnest of

21  preemption claims: that a state conservation statute designed to protect wildlife somehow

22  undermines the objectives of an international treaty aimed at the exact same purpose. But if

---

[8] As such, this case turns on an entirely different question than *April in Paris v. Bonta*, No. 2:19-CV-02471-KJM-CKD, 2023 WL 2392818 (E.D. Cal. Mar. 7, 2023), and other related cases, despite its challenge to the same statute.

anything, the opposite is true. Each of Plaintiffs' implied preemption theories fail, and a holding to the contrary would flout Ninth Circuit precedent and create an untenable new standard for courts across the country.

Plaintiffs' preemption theory would also lead to the paradoxical result that listing under CITES makes domestic commerce in an imperiled species *easier*, and state legislation aimed at protecting such species *more difficult*. Allowing such "[p]erverse incentives . . . in this potentially counterintuitive system" may be unavoidable when there is an express preemption clause, *Apr. in Paris*, 2023 WL 2392818, at *14, but it cannot exist here, in the face of the "presumption against the pre-emption of state police power regulations," *Medtronic*, 518 U.S. at 485, and with no indication whatsoever that any arm of the federal government intended such "anomalies," *Apr. in Paris*, 2023 WL 2392818, at *14.

A. Section 653o(c) is Not Preempted Because CITES and Implementing U.S. Regulations Expressly Contemplate and Authorize State-Level Regulation

Plaintiffs' implied preemption theories fail because at every level of implementation, CITES not only recognizes, but also actively promotes and preserves the rights of Parties (including their political subdivisions) to enact additional regulations and restrictions on domestic trade in CITES-listed species. In short, there can be no *implied* preemption when both the international treaty and the federal regulations implementing that treaty *expressly* disclaim any preemption at all.

At the highest level—CITES itself—the treaty recognizes that its terms "shall in no way affect the right of Parties to adopt . . . stricter domestic measures regarding the conditions for trade, taking, possession or transport of specimens of species included in Appendices I, II and III, *or the complete prohibition thereof*," CITES, 27 U.S.T. 1087, art. XIV, ¶ 1(a) (emphasis added), and that

[t]he provisions of the present Convention shall in no way affect the provisions of *any domestic measures . . .* relating to *other aspects of trade, taking, possession, or transport* of specimens which is in force or subsequently may enter into force for any Party including any measure pertaining to the Customs, public health, veterinary or plant quarantine fields,

*id.*, art. XIV, ⁋ 2 (emphasis added). Plaintiffs correctly assert that it is the United States, not California, that is a Party to CITES. ECF 25-1, at 17-18. But explicit recognition that a Party *may* adopt stricter domestic regulations does not mean that a political subdivision of a Party, like a U.S. State, *may not* adopt such regulations. In fact, the opposite is true. CITES' recognition that a Party may have more restrictive "domestic measures" logically includes measures adopted in only part of the Party's jurisdiction. The Ninth Circuit has said as much, finding "State laws are deemed domestic measures [under CITES]." *Man Hing Ivory & Imports, Inc.*, 702 F.2d at 762; *H.J. Justin & Sons, Inc. v. Deukmejian*, 702 F.2d 758, 760 n.2 (9th Cir. 1983) ("Article XIV of the Convention specifically permits domestic measures, along the lines of Cal.Penal Code § 653o, restricting or prohibiting trade or transport of parts or derivatives of [CITES-listed species]"); *see also CITES Glossary*, CITES, https://cites.org/eng/resources/terms/glossary.php) (defining "[d]omestic trade" as "[a]ny commercial activity, including, but not limited to, sale and purchase, within the territory under the jurisdiction of a Party") (last visited Oct. 5, 2023). The text of CITES therefore explicitly disavows any suggestion that its terms prohibit, preempt, or even alter a state statute like Section 653o. The Ninth Circuit has affirmed this reading, twice. *Man Hing Ivory & Imports, Inc.*, 702 F.2d at 762 ("The Convention, therefore, cannot itself preempt California law."); *H.J. Justin & Sons, Inc.*, 702 F.2d at 759 n.2 (affirming).

Recognizing that the text of the treaty is hostile to their claims, Plaintiffs urge that Section 653o(c) is preempted not by CITES, but "by FWS's Regulations [i]mplementing CITES at 50 C.F.R. Part 23," under a theory of obstacle preemption. ECF 25-1, at 23. But these regulations, too, actively acknowledge and preserve both other federal schemes and States' rights to enact and

enforce additional restrictions on the trade of CITES-listed species. *Supra* Section II(D). First, the regulations *open* with the disclaimer that anyone "engaging in activities with specimens of CITES-listed species," 50 C.F.R. § 23.2, "may [also] need to comply" with requirements under "other Federal, State, tribal, or local" laws, *id.* § 23.3(d).[9] The regulations later include a more specific mandate that CITES document-holders "must comply with all applicable local, State, Federal, tribal, and foreign wildlife or plant conservation laws." *Id.* § 23.56(a)(1). These regulations make clear that states are free to adopt additional requirements for trade in CITES-listed species.

FWS has repeatedly, consistently, and publicly reiterated this position. In its last revision of the CITES implementing regulations, the agency acknowledged that "[m]ore restrictive State or local laws that regulate or prohibit the import, export, or re-export of such species, or their parts, products, or derivatives, must be observed for CITES species that are not listed under the ESA." Revision of Regulations Implementing the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), 72 Fed. Reg. 48,402, 48,406 (Aug. 23, 2007). *See Barrientos*, 583 F.3d at 1208 (when determining whether federal regulation preempts state law, "the court asks 'whether the [federal agency] meant to pre-empt [the state law]'" (alterations in original) (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982))).

_____

[9] Plaintiffs cite *Radzanower* to suggest that this "general" requirement is controlled by the more "specific" requirement they read in § 23.56(a)(1). ECF 25-1, at 16 n.9. But the Supreme Court held that "a *statute* dealing with a narrow, precise, and *specific subject* is not submerged by a *later enacted statute* covering a more *generalized* spectrum"—not that a narrow provision later in a regulatory scheme supersedes the plain language of an earlier provision in the *same scheme*. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976). It would make no sense to provide that individuals may be subject "other . . . State . . . requirements," 50 C.F.R. § 23.3(d), if what FWS meant is that individuals are *only* subject to "applicable . . . State . . . wildlife or plant *conservation* laws," 50 C.F.R. § 23.56(a)(1) (emphasis added). *See In re Volkswagen*, 959 F.3d at 1214 ("[A] court must interpret a saving clause as it would any statutory language: giving effect to its plain language and meaning in a way that best comports with the statute as a whole.").

FWS has also repeatedly recognized this requirement in public-facing documents shared with the regulated community. Five years after revising its CITES implementing regulations, FWS published a document that describes its three-step process for applying for a CITES permit or certificate. U.S. Fish & Wildlife Serv., *CITES Permits and Certificates* 2 (2012), attached as Hendrix Decl. Ex. 4. After completing a standard application form, FWS advises that an applicant's second step should be "[c]ontact[ing] [their] State wildlife or plant conservation agency . . . to determine any additional requirements." *Id.* Most recently, in a 2021 document titled "Importing and Exporting Your Commercial Wildlife Shipment," FWS warns that anyone wishing to engage in commercial wildlife trade "must also ensure that [their] wildlife shipment complies with *state . . . wildlife laws*." U.S. Fish & Wildlife Serv., *Importing and Exporting Your Commercial Wildlife Shipment* 4 (2021) (emphasis added), attached as Hendrix Decl. Ex. 5. The document goes on to advise that, regardless of the existence of a CITES document, regulated parties "should also contact [their] state fish and wildlife agency about any state requirements or restrictions." *Id.* None of these acknowledgements narrow the scope of the state laws regulated entities must comply with to those with a "conservation purpose." *Infra* Section IV(D)(i).

Of course, the fact that an *international* treaty that governs the regulation of *international* trade, its implementing regulations, and the agency tasked with implementing the treaty all repeatedly disclaim any effect on *state* law should not be surprising. CITES is focused on "the protection of certain species of wild fauna and flora against over-exploitation through *international trade*." CITES, 27 U.S.T. 1087, Preamble (emphasis added). FWS' repeated insistence that these regulations do not impact state-level legislation and regulation makes perfect sense, because state law is simply outside the reach of CITES. *See also CITES Permits and Certificates,* Hendrix Decl. Ex. 4, at 2 ("CITES imposes no controls on shipments between States or U.S. territories…"). These repeated and comprehensive express acknowledgements and

referrals to more restrictive state law disclaim any theory of implied preemption. *See Nacarino v. Kashi Co.*, 77 F.4th 1201, 1212 (9th Cir. 2023) ("The regulations are not ambiguous and are sufficient to support our preemption holding, but the agency's interpretation of its own regulations reinforces that conclusion. We may properly resort to an agency's interpretations and opinions for guidance, as they constitute a body of experience and informed judgment." (internal quotations omitted)).

    B.  <u>There is No Conflict Preemption Because Section 653o(c) Does Not Make it "Impossible" to Comply with CITES Implementing Regulations</u>

Plaintiffs argue that Section 653o(c) makes it a "physical impossibility" to comply with federal requirements. ECF 25-1, at 25 (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)). Such claims of impossibility preemption are subject to "demanding" standards, particularly when, as here, "[Plaintiffs] ha[ve] failed to demonstrate that it was impossible for [them] to comply with both federal and state requirements," and indeed have "offered no such evidence" at all. *Wyeth*, 555 U.S. at 572-73.

On the contrary, Plaintiffs have provided evidence that they *can* comply with both federal and state law. If Plaintiffs choose to import Teju, Ring, or Nile lizard specimens into the United States, they must (and presumably do) comply with the requirements of CITES implementing regulations for these Appendix II species: namely, obtaining an "[e]xport permit" from the country of origin. 50 C.F.R. § 23.20(e); ECF 25-2, at 3 (providing "Foreign CITES Permit Num[bers]" for *Salvator merianae*). At the same time, Plaintiffs may not "import into [California] for commercial purposes, [] possess with intent to sell, or [] sell within the state, the dead body, or any part or product thereof" of a Teju, Ring, or Nile lizard. Cal. Penal Code § 653o(c); ECF 25-1, at 9 ("Prior to Section 653o(c)'s implementation on January 1, 2022, Plaintiffs traded in several TNR lizard species into and within the State of California."). Thus, Plaintiffs can, and in fact do, comply with both federal and state law. CITES does not mandate that Plaintiffs trade in these

lizard species—in California or indeed at all—but rather dictates the terms under which Appendix

II species may be exported, and the same is true of CITES implementing regulations. *See*

*Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 334 (5th Cir. 2007)

("It is certainly not physically impossible to comply with the [federal statute] and [the state law].

Complying with [the state law] by not selling, possessing, or transferring horsemeat for human

consumption would not breach any provision in the [federal statute].") Setting the terms for

import and export of wildlife products is quite different from mandating that domestic commerce

in those products occur.

C. Lawful Import of a Specimen Under CITES Does Not Provide an Affirmative Grant of
   Authority for Domestic Commerce in the United States

Plaintiffs submit that "FWS *authorizes* trade in [Teju, Ring, and Nile] lizards under the ESA

and its regulations implementing CITES at 50 C.F.R. Part 23," ECF 25-1, at 9 (emphasis added),

but this simply is not true. Nothing in FWS regulations *authorizes* domestic commerce in these

species.[10] Under the CITES regime, the treaty and FWS' regulations establish the requirements

for international trade in CITES-listed species, but they do not authorize anything. It is the CITES

permit (or permits) that authorize international trade. For these Appendix II lizard species, it is the

exporting country that issues an *export* permit, authorizing *international* trade. There is no role

for any U.S. authority beyond ensuring the shipment has the necessary *export* permit before

entering U.S. borders. 50 C.F.R. § 23.20(e). Moreover, compliance with FWS' regulations does

not provide an affirmative grant of authority to engage in any conduct post-import, nor does it

provide an exemption from compliance with other applicable limitations, regulations, and

restrictions. *Supra* Section IV(A). Compliance with these regulations also does not bar states from

---

[10] The CITES implementing regulations at issue here stand in stark contrast to the ESA
regulations at issue in *April in Paris*, 2023 WL 2392818, and other related cases, which provide
that "[a]ny person *may*" engage in certain commercial conduct, 50 C.F.R. § 17.42(a)(2)(ii)
(emphasis added).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

prohibiting other conduct with CITES-listed species, such as sale or possession, altogether. *See*

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1116 (9th Cir. 2022),

*cert. denied sub nom. Ass'n des Éleveurs de Cananards et D'oies du Quebec v. Bonta*, 143 S. Ct.

2493 (2023) ("It is another thing entirely to forbid a state from prohibiting sales just because a

federal agency has issued some guidance that addresses some aspect of a product . . . states[]

[maintain their] authority to prohibit the sale of certain products within their borders."); *R.J.*

*Reynolds Tobacco Co. v. Cnty. of Los Angeles*, 29 F.4th 542, 555 (9th Cir. 2022), *cert. denied sub*

*nom. R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles, California*, 143 S. Ct. 979 (2023) ("The

TCA effectively *carves out* federal power from a historical body of state and local authority by

setting the *floor* . . . while still preserving states and localities' broad power over regulation of the

sales of those products . . . [A] sales ban fits comfortably within [this] authority of states"

(emphasis added)).

    As the regulations alone do not provide affirmative authorization, Plaintiffs further contend

that because they are a "CITES permit holder," ECF 25-1, at 25, in species "subject to FWS-

issued permits," *id.* at 11, they are "federally authorized to trade in these species," *id.* at 9. There

are two flaws with this argument. First, possession of a CITES permit does not provide

authorization for any commercial conduct following import. Second, Plaintiffs do not actually

possess a CITES import permit for the species at issue here, so there is no federal authorization.

    Even if Plaintiffs did possess a federal permit, when federal licenses affirmatively authorize

some conduct—like import—states retain their power to prohibit related conduct not explicitly

authorized by the permit. *See* 50 C.F.R. § 13.42 (incorporated by reference by 50 C.F.R §

23.56(a)(1) and providing that "authorizations on the face of a permit that set forth specific

[allowed conduct] . . . are to be strictly interpreted and will not be interpreted to permit similar or

related matters outside the scope of strict construction"); *UFO Chuting of Hawaii, Inc. v. Young*,

380 F. Supp. 2d 1160, 1165 (D. Haw. 2005), *aff'd sub nom. UFO Chuting of Hawaii, Inc. v. Smith*, 508 F.3d 1189 (9th Cir. 2007) ("[Plaintiffs'] federal license allows it to engage in [some] trade; it does not allow it to engage in the most profitable *type* of . . . trade given its [business model]. [Plaintiffs] . . . can conduct [only the] commercial activity [expressly authorized by federal law]; their federal licenses provide no further rights."); *Cresenzi Bird Importers, Inc. v. State of N.Y.*, 658 F. Supp. 1441, 1446 (S.D.N.Y.), *aff'd*, 831 F.2d 410 (2d Cir. 1987) ("Plaintiffs' licenses are required as part of a general regulatory scheme . . . Since [Congress] did not . . . indicate that a license . . . would supersede more restrictive state laws, plaintiffs' federal licenses cannot be considered preemptive of [state] law."). So even if Plaintiffs possessed a FWS-issued CITES permit, that permit would not provide authorization for any conduct *following* importation.

Despite Plaintiffs' assertion that at least one of them possesses a "permit to trade in CITES-listed Argentine black and white tegu lizards," ECF 25-1, at 11 n.4 (citing Pls.' Ex. A, ECF 25-2, at 3), making them "federally authorized to trade in these species by FWS," ECF 25-1, at 9, they *do not possess any such permit*. Plaintiffs' Exhibit A is a Form 3-177, a declaration sheet completed by importers of *all* wildlife specimens (not only CITES-listed ones), which serves as a means by which FWS engages in information collection and law enforcement—not authorization. *Compare* Pls.' Ex. A, ECF. 25-2, at 3, *with* Declaration of Nicholas Arrivo ("Arrivo Decl."), Ex. 6 and 7 (actual United States CITES import permits). Notably, on Plaintiffs' Form 3-177, where Plaintiffs' United States CITES import permit number would go, if they had one, Plaintiffs themselves have only entered "NA": not applicable. ECF. 25-2, at 3. Plaintiffs do not possess a

United States CITES import permit for Teju, Ring, or Nile lizards (nor could they, as FWS does not require, and therefore does not issue, such permits for CITES Appendix II species).[11]

Furthermore, the Ninth Circuit has *already held* that Section 653o is not preempted with respect to CITES Appendix II species not listed under the federal ESA. *H.J. Justin & Sons, Inc.*, 702 F.2d at 759 ("We sustain the balance of the district court's holding that the section 653 o prohibition on trade in pythons and kangaroos is not preempted by the terms of the Endangered Species Act or implementing regulations . . . Since the Secretary has not listed either the Indonesian python or the Wallaby kangaroo as 'endangered' or 'threatened' . . . "). Plaintiffs attempt to distinguish this conclusive authority on the grounds that it 1) "did not involve (or at least did not consider) trade under CITES permits," and 2) "was decided prior to the relevant FWS regulatory revisions that were promulgated in 2007." ECF 25-1, at 10. The first point is easily dismissed, as the present case, too, does "not involve . . . trade under" any FWS-issued CITES permit since Plaintiffs, again, do not possess a United States CITES import permit. As to the second, the 2007 regulations only made it *more* clear that state restrictions are not preempted, with the "addition of a new paragraph notifying the regulated community of the additional requirement for complying with State, tribal, and local requirements when engaging in activities with CITES species," as well as an explicit incorporation of the holding in *H.J. Justin & Sons, Inc*. 72 Fed. Reg. at 48,406 ("More restrictive State or local laws that regulate or prohibit the import, export, or re-export of such species, or their parts, products, or derivatives, must be observed for CITES species that are not listed under the ESA.").

---

[11] To the extent that Plaintiffs' arguments rely on their—or anyone's—possession of a United States CITES import permit for Teju, Ring, or Nile lizards, Intervenor-Defendants respectfully suggest that this fact alone provides sufficient grounds to grant Intervenor-Defendants' Motion for Summary Judgment.

Case No. 2:22-cv-02105-KJM-CKD
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

1

2

D.  <u>Section 653o Does Not Provide an Obstacle to the Objectives of CITES or its Implementing Regulations</u>

3

Plaintiffs next argue that Section 653o(c) is preempted because it "stands as an obstacle to

4

FWS's congressionally delegated authority . . . to set the rules for trade in CITES-regulated

5

species in the United States," specifically because "Section 653o(c) does not advance a

6

conservation purpose as it applies to [Teju, Ring, and Nile] lizards." ECF 25-2, at 24. Claims of

7

obstacle preemption are accepted "in only a small number of cases," and courts should "not infer .

8

. . inten[tion] to preempt state enactments merely because they overlap with a federal" scheme. *In*

9

*re Volkswagen*, 959 F.3d at 1212-13. This is "especially" so when, as here, the federal scheme

10

"expressly or impliedly preserves state laws that might overlap with [it]." *Id.* at 1213; *supra*

11

Section IV(A). Such "provision[s] preserving states' enforcement authority" are given "great

12

weight." *In re Volkswagen*, 959 F.3d at 1213. Because Section 653o neither "directly interfere[s]

13

with the operation of [a] federal program," nor prevents a "program that the federal regulation[s]

14

deliberately impose[]," it does not pose an obstacle to the federal implementation of CITES and is

15

16

not preempted. *Id.* at 1212-13.

17

18

i.  *State Restrictions Do Not Need to Have a "Conservation Purpose" in Order to be Valid Under CITES or its Implementing Regulations*

19

20

Plaintiffs accept that there may be some state laws that are not preempted by FWS' CITES

21

regulations, but insist that the regulations preempt all state laws that are not "conservation laws."

22

ECF 25-1, at 14-18. In Plaintiffs' view, courts must engage in what amounts to strict scrutiny to

23

determine whether a state law like Section 653o constitutes a bona fide "conservation law,"

24

second-guessing the judgment of state legislatures by assessing competing evidence on the

25

26

27

28

ecological status of a species.[12] Thankfully, this unworkable approach lacks any compelling

support in the relevant regulations and should be rejected.

First, Plaintiffs' theory rests completely on an illogical reading of a single FWS regulatory

provision. This regulation provides that a holder of a CITES permit, *inter alia*, "must comply

with all applicable local, State, Federal, tribal, and foreign wildlife or plant conservation laws."

50 C.F.R. § 23.56(a)(1). Plaintiffs massively overread this provision as evidence of FWS' intent to

preempt all state laws that are *not* "conservation laws." ECF 25-1, at 15-18. But the regulation's

directive that a permitholder must comply with conservation laws does not mean that they do *not*

need to comply with any other laws.[13] A better reading of the inclusion of "conservation" in

Section 23.56(a)(1) is an explicit acknowledgement that CITES—an agreement concerned

primarily with addressing the threat from "over-exploitation through international trade," 27

U.S.T. 1087, Preamble—is not and is not intended to be the *sole* conservation authority for

species included in its Appendices. Plaintiffs' reading is not articulated in any FWS guidance; in

fact, the agency has said the *opposite* at least three separate times. *Supra* Section IV(A).

Moreover, CITES implementing regulations contain an entirely separate, earlier

acknowledgement that compliance with CITES and its implementing regulations does *not* exempt

one from "compl[iance] with other Federal, State, tribal, or local requirements." 50 C.F.R. §

23.3(d); *supra*, n.9.

---

[12] The "conservation purpose" standard that Plaintiffs advocate for is ill-defined, but it seems to involve some combination of addressing "endangered species or threatened species," ECF 25-1, at 18-19, efforts that are undertaken "proactive[ly]" before trade occurred in the species, *id.* at 21, but also evidence that the trade in the species is "growing and expanding," *id.* at 22, and potentially an active *disregard* for any "moral objection[s]" to the endangerment of such species, *id.* at 24.
[13] Intervenor-Defendants note, again, that Plaintiffs do not possess a FWS-issued CITES import permit, *supra* Section IV(C), and so even if this argument were compelling—which it is not—it would not apply to Plaintiffs' desire to trade in Teju, Ring, and Nile lizard parts.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7

It is against this backdrop that Plaintiffs' new "ESA-tethered conservation purpose" test must be evaluated. ECF 25-1, at 21. Plaintiffs suggest this standard is based on the "careful balance between the recognition of states' conservation concerns for wildlife and the federal government's exclusive authority to manage trade in CITES-listed species" that FWS struck.[14] *Id.* at 6. As evidence of Plaintiffs' articulated deliberate balance that is intended to preempt all non-conservation-based state laws, Plaintiffs offer two sources.

8
9
10
11
12
13
14
15
16

First, Plaintiffs point to a sampling of legislative history of the Endangered Species Act's express preemption clause, Section 6(f) of the ESA. *Id.* at 15-17. But both the Ninth Circuit and Plaintiffs themselves have acknowledged that this clause *does not apply* in the present case. *See H.J. Justin & Sons, Inc.*, 702 F.2d at 759 ("Since the Secretary has not listed [the relevant Appendix II species] as 'endangered' or 'threatened' . . . *section 6(f) of the [ESA] has no application to state regulations restricting or prohibiting trade in those species.*"); ECF 25-1, at 10 ("the ESA's express preemption provisions do not apply, as the ESA does not list TNR lizards").

17
18
19
20
21

Second, Plaintiffs attempt to take an explanation of CITES Article XIV provided at some ESA hearings and stretch it into an argument that because the United States *may* adopt "stricter domestic measures," somehow California *may not*. *Id.* at 17-18; *supra* Section IV(A) (explaining that state measures are "domestic measures" under CITES).

22
23
24
25
26

That's it. Plaintiffs' entire "conservation purpose" theory rests on these two unpersuasive and irrelevant authorities, which do not suffice to meet the lofty standard for implied preemption. Indeed, "[t]o evaluate a claim based on . . . 'obstacle preemption' . . . a court must identify the 'full purposes and objectives' of the federal law from '*the text and structure of the [law] at issue*'

27
28

---

[14] *Supra* Section IV(A) (FWS expressly disavowing the assertion it has "exclusive authority to manage trade in CITES-listed species.").

. . . not the priorities and preferences of federal officers or the 'unenacted approvals, beliefs, and desires' of Congress." *In re Volkswagen*, 959 F.3d at 1212 (citations omitted) (emphasis added). But Plaintiffs do not point to *any* evidence of preemption from "the text and structure" of the regulations at issue,[15] nor could they, since the text of the regulations actually provides the exact opposite. *Supra* Section IV(A). As such, even if the "'high threshold' which 'must be met if a state law is to be preempted for conflicting with the purposes of a federal [scheme]'" were substantially lower, Plaintiffs would not be able to see it—never mind reach it. *In re Volkswagen*, 959 F.3d at 1225 (citations omitted).

Moreover, not only would this theory rob states of their long-held power to regulate conduct within their borders, it would hand it not to the federal government, but to the judiciary. Plaintiffs would not have this Court evaluate what constitutes a "conservation statute" within the context of the legislature's intent, *supra* Section II(A), but rather by applying its own scrutiny to assess the validity of scientific and social underpinnings of a state wildlife statute to determine if it is genuinely a "conservation" statute, ECF 25-1, at 18-22. This is a wholly unmanageable standard and impossible to apply with any consistency. *Supra* n.2 (California and other state statutes that would be illogically and inconsistently preempted). Plaintiffs' theory leads to an absurd result all around: for the State of California, for the judiciary, for Americans who rely on these state protection statutes, and most of all for CITES-listed species, including the lizard species at issue here.

    *ii.  AB 1260 is a Conservation Statute*

Even accepting Plaintiffs' misguided reading of the law, Section 653o would not be preempted because it *is* a "conservation law." In the context of an international and federal

---

[15] Plaintiffs also cannot identify a single regulation that actually reaches the conduct Section 653o(c) addresses: possession and commerce in Teju, Ring, and Nile lizards in the State of California.

Case No. 2:22-cv-02105-KJM-CKD

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

scheme designed to protect species from exploitation, Section 653o only supports, not

undermines, that purpose. AB 1260 was passed in 2019 under the explicit recognition that there

was a growing body of scientific literature concerning the overexploitation of reptiles. Among the

risks from the global trade in lizard skins, including into the State of California, is that allowing

trade in lookalike species poses threats to imperiled wildlife. *Supra* Section II(A); *see also* S.

Natural Res. Rep., at 5 ("As noted above, not every species included in . . . this bill is threatened

or endangered. Some may even have increasing populations. However, as CITES acknowledges .

. . there is a reasonable argument to include look-alike species in trading restrictions . . . This

should help with respect to enforcement."); *id.* ("The potential for local extirpation followed by

larger scale extinction is possible, particularly for species that already are at risk due to habitat

loss, and other factors."). Plaintiffs' displeasure at their newfound inability to conduct some

portion of their business in the state does not make it this Court's job "to re-litigate a policy

disagreement that the California legislature already settled." *Pena v. Lindley*, 898 F.3d 969, 979-

80 (9th Cir. 2018) ("[W]e 'owe [the legislature's] findings deference in part because the

institution is far better equipped than the judiciary to amass and evaluate the vast amounts of data

bearing upon legislative questions.'" (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180,

195 (1997)) (alteration in original)).

Plaintiffs' assertion that Section 653o is not a "conservation statute" because it does not

"provide a single cognizable conservation justification, *as the ESA employs the term*, for the TNR

lizard ban," ECF 25-1, at 19 (emphasis added), is frankly nonsensical. The ESA definition for the

term "conserve," on which Plaintiffs so heavily rely, applies only to species listed as endangered

or threatened under the ESA. 16 U.S.C. § 1532(3). But the provision from which Plaintiffs pull

this conservation mandate, 50 C.F.R. § 23.56, does not even address domestically listed

endangered and threatened species under the ESA. It addresses CITES-listed species and the

additional requirements that apply to them. Plaintiffs seem to seriously be suggesting that the only state "conservation laws" *not* preempted by CITES implementing regulations are those that address *federally* listed endangered and threatened species. This makes no sense, as the provisions of CITES apply to thousands more species than the ESA does, and nowhere else does CITES or its implementing regulations limit their own application by incorporation of the ESA's narrower standards.[16] Doing so would produce absurd results, untethered to any evidence of Congressional or agency intent: state laws with obvious conservation purposes for species listed under Appendix II of CITES, but not the federal ESA—like hippos—could *never* be a "conservation law" and thus would *always* be preempted. *See, e.g.*, Cal. Fish & Game Code § 2022(b) (prohibiting the sale of hippopotamus parts); Haw. Rev. Stat. Ann. § 183D-66(a) (same); Md. Code., Nat. Res. § 10-2B-04 (same).

Section 653o is a conservation statute, and it provides no obstacle to the goals of CITES and its implementing regulations. Plaintiffs' arguments to the contrary are unconvincing and would result in an absurd and unmanageable new standard for courts across the country to apply.

## V.  CONCLUSION

For the foregoing reasons, Intervenor-Defendants respectfully request that the Court grant their motion for summary judgment and deny Plaintiffs' motion for summary judgment.

**DATED**: October 6, 2023                    Respectfully submitted,

                     /s/ Katherine Hendrix
                    Katherine Hendrix (Bar No. 336792)
                    The Humane Society of the United States
                    1255 23rd St. NW, Suite 450
                    Washington, D.C. 20037

---

[16] Plaintiffs' incorporation of the ESA's definition of a declension of "conservation" is also problematic in that it would, once again, put the judiciary in charge of determining when conservation measures "are no longer necessary," ECF 25-1, at 18-19 (quoting 16 U.S.C. § 1532(3)), effectively making the conservation statute no longer a conservation statute, and usurping the role of the legislature.

1                              khendrix@humanesociety.org
                                 (617) 872 0558

2

3                              Nicholas Arrivo (Bar No. 296173)
                             The Humane Society of the United States

4                              1255 23rd St. NW, Suite 450
                             Washington, D.C. 20037

5                              narrivo@humanesociety.org
                             (202) 961 9446

6

7                              *Attorneys for Intervenor-Defendants*
                             *The Humane Society of the United States,*
                             *Humane Society International, and the*

8                              *Center for Biological Diversity*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 2:22-cv-02105-KJM-CKD

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT