UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Boot Barn, Inc. and Dan Post Boot Company, | No. 2:22-cv-02105-KJM-CKD |
| Plaintiffs, | ORDER |
| v. | |
| Rob Bonta, | |
| Defendant. | |

      Boot Barn, Inc. and the Dan Post Boot Company sell western wear. They would like to sell boots and other products made from the leather of several species of large lizards known as Teju, Nile and Ring lizards, but the California Penal Code bars trade in products made from those lizards. Boot Barn and Dan Post contend in this lawsuit that the federal Endangered Species Act and related federal regulations implicitly preempt California from enforcing its prohibition. As explained in this order, the court cannot agree: the federal laws and regulations in question do not imply states must permit trade in Teju, Nile and Ring lizard products. The court grants the state's and the intervening defendants' motions for summary judgment, and denies plaintiffs' motions.

**I.    BACKGROUND**

      As this court summarized in another similar case, the Endangered Species Act calls for cooperation between federal and state governments. *See April in Paris v. Bonta*, 659 F. Supp. 3d 1114, 1118 (E.D. Cal. 2023). But the Endangered Species Act does preempt some state laws and

1

1  regulations. Preemption was, in fact, "of 'great interest'" during the debates about the bill that
2  would eventually become the Endangered Species Act. *Id.* at 1128 (quoting H.R. Rep. No. 412,
3  93rd Cong., 1st Sess. 7 (July 27, 1973)). State attorneys general from New York and California
4  in particular voiced concerns about parts of the bill that might prevent their states from protecting
5  species they thought were deserving. *See id.*

6  In response, the administration officials who had drafted the provisions clarified that they
7  did not intend to "void state laws, such as New York's Mason Act, which apply to the sales of
8  species not appearing on the Federal endangered species lists." *Id.* (emphasis omitted) (quoting
9  Hearings before the Subcommittee on Fisheries and Wildlife Conservation of the Committee on
10 Merchant Marine and Fisheries of the U.S. House of Representatives on H.R. 2169 and 4758
11 (House Committee Hearings) at 351, 358 (Mar. 27, 1973)). "The administration had no concerns
12 if states wished to regulate takings within their borders more strictly." *Id.* at 1129. But these
13 officials urged Congress to void any state laws that "thwarted" federal purposes, "especially
14 because the federal programs would implement the United States' obligations under international
15 treaties." *Id.* (quoting House Committee Hearings at 351, 358).

16 These discussions eventually culminated in Section 6(f) of the Endangered Species Act.
17 *See* 16 U.S.C. § 1535(f). First, under that section, federal law expressly preempts any contrary
18 state laws and regulations:

> Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively (1) permit what is prohibited by this chapter or by any regulation which implements [the Endangered Species Act], or (2) prohibit what is authorized pursuant to an exemption or permit provided for in [the Endangered Species Act] or in any regulation which implements [that Act].

27 16 U.S.C. § 1535(f). Second, the express preemption includes a savings clause to clarify that
28 states may otherwise continue to protect wildlife and enforce their own prohibitions:

> [The Endangered Species Act] shall not otherwise be construed to void any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such fish or wildlife. Any State law or regulation

2

<blockquote>
respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined.
</blockquote>

*Id.*

An international effort to protect endangered species also was underway while Congress debated and passed the Endangered Species Act: the Convention of International Trade in Endangered Species of Wild Flora and Fauna, commonly abbreviated "CITES." Congress in fact intended for the Endangered Species Act to implement the United States' obligations under CITES. *See* 27 U.S.T. 1087 (Mar. 3, 1973); *see also* 16 U.S.C. § 1531(a)(4)(F); S. Rep. No. 93-307, Endangered Species Act of 1973, 93rd Cong., 1st Sess., at 5 (July 1, 1973) ("[T]he bill provides a means for implementation of the regulations of the Convention on International Trade in Endangered Species of Wild Fauna and Flora if and when that Convention is ratified by the Senate."). CITES governs international trade in many specifically listed wildlife and plant species, which it divides into three categories, each of which is fleshed out in an appendix. The rules that govern trade in animal specimens—some stricter than others—depend on whether the species in question is included in one of three appendices. *Compare, e.g.*, 27 U.S.T. 1087, Art. III (regulation of specimens of species listed in the first appendix) *with, e.g., id.* Art. IV (regulation of specimens of species listed in the second appendix).

Like the Endangered Species Act, CITES acknowledges the validity of other legal protections. For example, the treaty expressly allows "stricter domestic measures regarding the conditions for trade, taking possession or transport of specimens included in [the three appendices] or the complete prohibition thereof." *Id.* Art. XIV, ¶ 1(a). It also allows parties to the treaty to adopt "domestic measures restricting or prohibiting trade, taking possession, or transport of species not included in [the three appendices.]" *Id.* Art. XIV, ¶ 1(b). And it clarifies it does not "affect the provisions of any domestic measures . . . relating to other aspects of trade, taking, possession, or transport of specimens . . . including any measure pertaining to the Customs, public health, veterinary or plant quarantine fields." *Id.* Art. XIV, ¶ 2.

In the United States, federal law gives the U.S. Fish & Wildlife Service responsibility for this country's CITES responsibilities. *See* 16 U.S.C. § 1537a(a). The Fish & Wildlife Service issues trade permits for listed species. *See* 27 U.S.T. 1087, Art. IX, ¶ (1)(a). Accordingly, it has adopted specific permitting regulations. *See, e.g.*, 50 C.F.R. § 23.20. But federal regulators have warned federal permits do not necessarily exempt their holders from laws passed by other governments. For example, in a section that explains what regulations may apply, the Fish & Wildlife Service first references several CITES provisions, but then cautions that a reader "may also need to comply with other Federal, State, tribal, or local requirements." 50 C.F.R. § 23.3(d). And in a section explaining the conditions of the CITES documents it issues, the Fish & Wildlife Service warns that people "must comply with all applicable local, State, Federal, tribal, and foreign wildlife or plant conservation laws." *Id.* § 23.56(a)(1).

This case is about a relatively recent California law, adopted in 2019, which added a list of newly prohibited animal products to an existing section of the state's penal code. Under the 2019 addition, "it is unlawful to import into this state for commercial purposes, to possess with intent to sell, or to sell within the state, the dead body, or any part or product thereof, of an iguana, skink, caiman, hippopotamus, or a Teju, Ring, or Nile lizard." Cal. Pen. Code § 653*o*(c). According to a legislative committee report, the amendment's authors were concerned that "[t]housands of lizards, stingrays, sharks, and other species of exotic animals are killed for their skins each year" and "experience a lifetime of stress related to intensive confinement, crowding, harsh and unnatural surroundings such as concrete, a lack of fresh water, irregular temperatures, and rampant disease." Report to the Cal. Assem. Comm. on Water, Parks & Wildlife on AB 1260 at 2 (Apr. 9, 2019).[1] The amendment "would protect these animals from experiencing unnecessary and inhumane torture." *Id.*

---

[1] https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200AB1260 (visited Mar. 24, 2025). The court takes judicial notice of this and the other portions of the legislative history of Assembly Bill 1260 cited in this order. *See, e.g.*, *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("Legislative history is properly a subject of judicial notice.").

Another legislative committee report suggests the bill's motivations went beyond these moral concerns and included "proactive" conservation goals as well. *See* Report to the Cal. Sen. Comm. on Nat. Res. & Water on AB 1260 at 3 (June 25, 2019).[2] That is, "to some degree," the bill was "an effort to curtail demand before it starts," at least "for some species." *Id.* These statements align with others memorialized in the bill's legislative history. Some of the animals on the list of proposed additions were "vulnerable" or "endangered" according to the "Red List" publicized by the International Union for Conservation of Nature. Report to the Cal. Assem. Comm. on Water, Parks & Wildlife on AB 1260 at 2 (Apr. 9, 2019). But others were not, and they were among the animals of "least concern" for extinction. *Id.* And so for these species, any conservation effort would be proactive by operation of the definitions.

The animal species at issue in this case, which the parties describe as "Teju, Ring, or Nile" lizards, fall into the second category, at least according to the committee report. The committee reports do not describe them as animals at risk of extinction, but rather animals of "least concern" for extinction. *See id.* at 4. The term "Teju lizards" refers to at least three species whose skins are traded commercially: *Salvator merianae*, the Argentine black and white tegu; *Salvator rufescens*, the red tegu; and *Tupinambis teguixin*, the gold tegu. *See* Intervenors' Resp. Stmt. Facts No. 3, ECF No. 30-2; State's Resp. Stmt. Facts No. 3, ECF No. 31-1. The term "Ring lizards" refers to *Varanus salvator*, the Asian water monitor, and the term "Nile lizards" refers to *Varanus niloticus*, the Nile monitor, both of which are species in the commercial skin trade. *See* Intervenors' Resp. Stmt. Facts Nos. 4–5; State's Resp. Stmt. Facts Nos. 4–5. All five species are listed as Appendix II species under CITES. *See* Intervenors' Resp. Stmt. Facts No. 6; State's Resp. Stmt. Facts No. 6. As a result, they must be exported or re-exported with a permit, but CITES demands no import permit. *See* 27 U.S.T. 1087, Art. IV, ¶¶ 2, 4. The parties do not dispute these lizards are not native to California, have not been introduced into California and do not migrate to or from California.

---

[2] https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200AB1260 (visited Mar. 24, 2025).

1    Plaintiffs Boot Barn and Dan Post trade in products made from these lizards' leather. *See*
2 Intervenors' Resp. Stmt. Facts No. 15; State's Resp. Stmt. Facts No. 15. Before the 2019
3 prohibitions in section 653*o* came into effect, they imported and sold products made from Teju,
4 Ring and Nile lizards in California. *See* Intervenors' Resp. Stmt. Facts No. 16; State's Resp.
5 Stmt. Facts No. 16. They say they would resume this trade if section 653*o*(c) could not be
6 enforced against them with regard to these lizard species. *Id.* They claim in this lawsuit that the
7 federal laws and regulations described above—those adopted under the Endangered Species Act
8 to enforce the United States' CITES obligations—preempt California's recent prohibition. Their
9 complaint names one defendant, the California Attorney General, who is sued in his official
10 capacity. In a previous order, the court permitted three environmental advocacy organizations to
11 intervene to defend section 653*o* alongside the Attorney General. ECF No. 26. The court also
12 previously approved the parties' proposal to litigate this case on cross-motions for summary
13 judgment. *See* Mins., ECF No. 18. Those motions have now been filed and are fully briefed. *See*
14 *generally* Pls.' Mem., ECF No. 25-1; Intervenors' Mem., ECF No. 30-1; State's Mem., ECF No.
15 31-4; Pls.' Opp'n, ECF No. 36; State's Reply, ECF No. 39; Intervenors' Reply, ECF No. 40. The
16 court submitted the matter for a decision without holding a hearing.

## II.    LEGAL STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this case, there is no genuine dispute of material fact. It is necessary only to decide whether the Endangered Species Act and its implementing regulations preempt section 653*o* as it relates to Teju, Ring and Nile lizards.

The starting point in that analysis is the "fundamental principle of the Constitution . . . that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Congress can preempt state laws expressly, as it did in section 6(f) of the Endangered Species Act. Congress might also preempt state laws by implication. Congress sometimes intends to occupy the entire regulatory field to the exclusion of any state's legislative efforts without spelling out that intention expressly. *See Arizona v. United States*, 567 U.S. 387,

6

399, 401 (2012). Courts also infer that a state law is "nullified to the extent that it actually conflicts with federal law." *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985). "Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (first quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963), then quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

These various theories of federal preemption "are not 'rigidly distinct'" from one another. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 n.6 (2000) (quoting *English v. General Elec. Co.*, 496 U.S. 72, 79 n.5 (1990)). But a dispute about preemption is no justification for "a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in the judgment)). Any conclusion that a state law or regulation is preempted "must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).

Federal courts have relied on a variety of tools to resolve disputes about whether a particular state law or regulation is preempted. The parties discuss three. First, when Congress has legislated "in [a] field which the States have traditionally occupied," courts usually "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see also Arizona*, 567 U.S. at 400 (reiterating this presumption). States have traditional authority to regulate "public health, safety, and morals." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991). Animal regulations of many kinds have long been understood to fall within that sphere. *See Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976) (collecting authority); *DeHart v. Town of Austin, Ind.*, 39 F.3d 718, 722 (7th Cir. 1994) (same); *Viva! Int'l Voice for Animals v. Adidas Promotional Retail Operations, Inc.*, 41 Cal. 4th 929, 938 (2007) (same). States and local governments also have traditionally been responsible

7

for policing local markets and businesses and the products they sell; that, too, has been understood for many years to fall within the same sphere. *See, e.g.*, *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 388 (2015); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146 (1963); *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 548 (9th Cir. 2022). In this case, the court recognizes California's laws about what animal products may be sold within its borders as within a field states have "traditionally occupied" and presumes Congress did not intend to prevent California from enacting those laws.

Second, "when Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' 'there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the legislation." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) (first quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978), then quoting *Cal. Fed. Savings & Loan Ass'n v. Guerra*, 479 U.S. 272, 282 (1987) (opinion of Marshall, J.)). But "[t]he fact that an express definition of the pre-emptive reach of a statute 'implies'—i.e., supports a reasonable inference—that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied pre-emption." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995). Applying these holdings to this case, it is reasonable to infer from the expressly preemptive language in section 6(f) that Congress did not implicitly preempt other state laws or regulations without foreclosing the possibility of any implicitly preemptive effects.

Third, the Supreme Court has held that "international relations" is "the one aspect of our government that from the [beginning] has been most generally conceded imperatively to demand broad national authority." *Hines*, 312 U.S. at 67–68 (footnote omitted). For that reason, the Court occasionally has written that state laws are more likely to be preempted in the realms of foreign affairs, international relations and similar areas. *See, e.g.*, *Boyle v United Technologies*, 487 U.S. 500, 507–08 (1988); *Maryland v. Louisiana*, 451 U.S. 725, 746–47 (1981). More recently, however, rather than employing any specific presumption about foreign affairs or international relations, the Supreme Court has relied on the same general rules it would use to

8

resolve any other preemption disputes. *See, e.g.*, *Arizona*, 567 U.S. at 400–15 (immigration); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420–27 (2003) (executive agreements); *Crosby*, 530 U.S. at 374–86 (sanctions). So in this case, following the Court's more recent opinions, this court will not presume that California's laws are invalid simply because the Endangered Species Act implemented the United States' international treaty obligations under CITES.

### III. DISCUSSION

Because this court's decision "must be grounded 'in the text and structure of the statute at issue,'" *Kansas*, 589 U.S. at 208 (quoting *CSX Transp.*, 507 U.S. at 664), the court begins with the expressly preemptive language Congress included within the Endangered Species Act: section 6(f). To review, that section voids every state law or regulation that "applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species," but only to the extent the state law or regulation permits what is prohibited or prohibits what is permitted by the Endangered Species Act and its implementing regulations. 16 U.S.C. § 1535(f). Congress also explained what it was not preempting: it was not otherwise voiding "any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife." *Id.* Nor was it preempting state laws and regulations that "permit or prohibit sale of such fish or wildlife." *Id.* It permitted states to continue enforcing their laws and regulations related to "the taking of an endangered species or threatened species" if those laws and regulations were "more restrictive" than federal laws and regulations. *Id.*

This language is detailed and precise. The first part of section 6(f) refers to state laws and regulations about "endangered species or threatened species," not to state laws about species that are neither endangered nor threatened. *Id.* So if a species is neither endangered nor threatened, state laws protecting that species would not be preempted. Then the second part of section 6(f) clarifies the Endangered Species Act does not preempt state laws and regulations "intended to conserve migratory, resident or introduced fish or wildlife" nor does it preempt state laws and regulations permitting or prohibiting the sales of "migratory, resident or introduced fish or wildlife." *Id.* This express language avoids confusion about the implications of the Endangered Species Act for state laws related to the conservation or sale of migratory, resident and introduced

9

fish or wildlife—endangered, threatened or otherwise. It is reasonable to infer from this detailed and precise language that if Congress had intended for the Endangered Species Act to have any broader preemptive effect, it would have said so.

This is not to say section 6(f) is utterly exhaustive. As plaintiffs point out, the lizard species at the center of this case are essentially non-endangered, non-threatened foreign species: they are not native to California's territory, have not been introduced into California's territory, do not migrate into California's territory and are neither threatened nor endangered in the eyes of federal regulators. *See* Pls.' Mem. at 8. Products made from those lizards are brought to the United States, and plaintiffs would like to sell them in California. Section 6(f) does not mention species in this specific category. But the reasons for this omission are clear from the context of section 6(f). The Endangered Species Act is a conservation program that directs Executive Branch officials to identify species in danger of extinction or likely to face that danger in the future. *See* 16 U.S.C. §§ 1531(b), 1532(6), 1532(20), 1533(a). Federal law protects those species by imposing specific prohibitions, with certain exceptions. *See, e.g.*, *id.* § 1532(19) (defining takings); *id.* § 1538(a) (listing prohibitions); *id.* § 1539(a) (allowing permits for some takings). If a species is neither threatened nor endangered in the eyes of federal regulators, then the Endangered Species Act would neither impose prohibitions nor grant permissions related to that species, regardless of where it is found, and states have free reign. This interpretation of the Endangered Species Act conforms with the ordinary assumption that Congress does not intend to supersede states' historically recognized police powers without making that intention clear. *See Arizona*, 567 U.S. at 400; *Rice*, 331 U.S. at 230.

The history behind section 6(f) supports the same conclusion. As summarized above, after the administration proposed an express preemption, representatives from at least two states, including California, came to Congress to ensure the Endangered Species Act would permit them to continue regulating trade in products made from foreign species. In response, the administration clarified it had not intended to stop states from imposing more protections than the federal government—as long as states' laws and regulations did not permit what the federal law prohibits or prohibit what federal law permits. So in a case like this one, which involves products

10

1    made from species that are neither endangered nor threatened and that federal regulations do not
2    mention, the history behind section 6(f) suggests Congress intended not to stymie a state's efforts
3    to regulate trade of those species' products within its own borders.
4         In sum, the terms of the express preemption in section 6(f) offer no evidence Congress
5    intended to preempt state laws in the sections of the California Penal Code the parties dispute
6    here. Instead, the preemptive language in section 6(f), the structure of the Endangered Species
7    Act and the history of its enactment all imply Congress did not intend to bar California from
8    enacting the prohibition plaintiffs challenge in this action. As this court summarized in *April in*
9    *Paris*, the Ninth Circuit reached essentially the same conclusion in the 1980s. *See Apr. in Paris v.*
10   *Bonta*, 659 F. Supp. 3d at 1119, 1125–26, 1130–31 (citing *H.J. Justin & Sons, Inc. v.*
11   *Deukmejian*, 702 F.2d 758 (9th Cir. 1983) (per curiam) and *Man Hing Ivory & Imports, Inc. v.*
12   *Deukmejian*, 702 F.2d 760, 763 (9th Cir. 1983)).
13        Plaintiffs' arguments for the opposite conclusion rest primarily one of the federal
14   regulations described in the background section above: 50 C.F.R. § 23.56(a)(1). That section is
15   part of a set of regulations adopted by the federal agency responsible for administering the United
16   States' CITES obligations. *See, e.g.*, Pls.' Mem. at 10. Section 23.56 is the final section in a
17   series framed as questions and answers. "How do I apply for a U.S. CITES document?" asks one
18   section. 50 C.F.F. § 23.32. "What are the requirements for an import permit?" asks another. *Id.*
19   § 23.35. The question in section 23.56 is similar: "What U.S. CITES documents conditions do I
20   need to follow?" The answer lists three types of conditions: general, standard and special. *See id.*
21   § 23.56(a), (b), (c). The first "general" condition is compliance "with the provisions of part 13 of
22   this subchapter as conditions of the [relevant] document, as well as other applicable regulations in
23   this subchapter," such as "any that require permits." *Id.* § 23.56(a)(1). The first "general"
24   condition also cautions the applicant "must comply with all applicable local, State, Federal, tribal,
25   and foreign wildlife or plant conservation laws." *Id.* Plaintiffs argue this regulatory condition
26   implicitly voids any law without a conservation purpose. In other words, by mentioning
27   conservation laws in particular, plaintiffs contend, federal regulators were implicitly limiting the
28   universe of permissible state and local laws.

The court is not persuaded. First of all, if taken to its logical conclusion, plaintiffs' reasoning would also imply, absurdly, that regulators were voiding federal and foreign non-conservation laws. Second, plaintiffs' interpretation also would bar state and local governments from passing and enforcing a wide variety of laws and ordinances meant to protect health and safety, such as food safety laws and product liability statutes. Those are not for conservation purposes, yet plaintiffs do not contend that states' health and safety laws are void. Third, plaintiffs' interpretation would implausibly require states and local governments to ensure their laws have only conservation purposes. Courts, too, would be required to examine whether a challenged law has no conservation purpose. It is difficult to see how lawmakers and courts could draw this line. Purposes overlap. Some legislators might favor a wildlife protection law because they want to preserve unique animals or their habitat. Others might want to prevent cruelty to animals. Still others might want to protect a favored domestic industry from foreign competition. And some legislators might have more than one motivation: conservation, prevention of cruelty and protection of domestic industries are not mutually exclusive purposes. This case is an example of potentially overlapping purposes. Some California legislators appear to have been concerned about harsh treatment of animals. Report to the Cal. Assem. Comm. on Water, Parks & Wildlife on AB 1260 at 2 (Apr. 9, 2019). Others appear to have been concerned that even if Teju, Ring and Nile lizards are not currently threatened or endangered, they might later be threatened or endangered if trade were permitted. *See* Report to the Cal. Sen. Comm. on Nat. Res. & Water on AB 1260 at 3 (June 25, 2019). Were the conservation-minded legislators' votes enough? Must they make up a majority? Plaintiffs' interpretation requires clear answers to these questions, but clear answers are likely unavailable in this and other cases, and the parties have cited no evidence in the record offering definitive answers for the statute plaintiffs challenge.

The context of the warning in section 23.56(a)(1) offers a simpler and far more likely interpretation than the one plaintiffs propose. Regulators were very likely dispelling a potential misunderstanding about the conditions of regulatory compliance: a federal permit or license may not be enough. Other conservation laws might very well apply. But that warning is not a

condemnation of non-conservation laws.  A warning about conservation laws is simply the most topical and important warning.  After all, the regulation implements a conservation statute.  Just as a "no smoking" sign communicates no implied exemption from, say, public intoxication laws, section 23.56(a)(1) communicates no exemption from applicable state and local laws and regulations unrelated to conservation.

Plaintiffs also contend the federal regulations must have some preemptive effect, lest the United States fall short of its CITES obligations.  As summarized above, however, CITES expressly allows "stricter domestic measures regarding the conditions for trade, taking possession or transport of specimens included in [the three appendices] or the complete prohibition thereof."  27 U.S.T. 1087, Art. XIV, ¶ 1(a).  It does not "affect the provisions of any domestic measures . . . relating to other aspects of trade, taking, possession, or transport of specimens . . . including any measure pertaining to the Customs, public health, veterinary or plant quarantine fields."  *Id.* Art. XIV, ¶ 2.

The parties have devoted many more pages of their legal memoranda to various debates about the effects of various federal and international permitting schemes, trade restrictions and other matters.  The court does not reach these debates.  This is a straightforward case with a straightforward answer.  California and other states have traditionally possessed authority to regulate trade in animals within their borders.  Congress expressly preempted many state laws when it passed the Endangered Species Act, but not state laws regulating trade in products made from animals that are neither threatened nor endangered in the eyes of federal regulators.  *See H.J. Justin*, 702 F.2d at 759–60.  The history of the preemptive language within the Endangered Species Act suggests strongly Congress did not intend to stop states like California from enforcing their own more restrictive rules, including the criminal prohibition at issue in this case.  The regulations cited in plaintiffs' motion do not preempt these more restrictive state laws, but rather warn that those laws will remain in force.  Reading the regulations as plaintiffs propose would contradict Congress's apparent intentions and lead to absurd results.

## IV.   CONCLUSION

For the reasons above, defendants' and intervenors' motions for summary judgment are **granted**, and plaintiffs' motion for summary judgment is **denied**.

This order resolves ECF Nos. 25, 30 and 31 and **closes the case**.

IT IS SO ORDERED.

DATED: March 24, 2025.

SENIOR UNITED STATES DISTRICT JUDGE